# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

WILLIAM M. HOFFMAN,                     )
                                        )    No. 13 CV 6916
                    Plaintiff,          )
                                        )
        v.                              )    Magistrate Judge Young B. Kim
                                        )
CAROLYN COLVIN, Acting                  )
Commissioner, Social Security           )
Administration,                         )
                                        )    September 21, 2015
                    Defendant.          )

## MEMORANDUM OPINION and ORDER

William Hoffman claims that he is entitled to Supplemental Security Income
("SSI") because he is disabled by a combination of impairments, including human
immunodeficiency virus ("HIV"), hepatitis, degenerative disc disease, neuropathy,
and diabetes. After the Appeals Council declined to review the Administrative Law
Judge's ("ALJ") decision denying him benefits, Hoffman filed this suit seeking
judicial review. See 42 U.S.C. § 405(g). Before the court are the parties' cross-
motions for summary judgment. For the following reasons, Hoffman's motion for
summary judgment is granted and the government's motion is denied:

## Procedural History

Hoffman applied for SSI on December 29, 2009, claiming that he became
disabled on September 30, 2009. (Administrative Record ("A.R.") 19, 129-36.)
Hoffman's claim was denied initially, and on reconsideration. (Id. at 19.)
Thereafter, Hoffman requested and was granted a hearing before an ALJ, which

took place on May 14, 2012.  (Id.)  On June 13, 2012, the ALJ issued a decision concluding that Hoffman is not entitled to SSI.  (Id. at 16-31.)  The Appeals Council declined review, (id. at 1-3), thereby rendering the ALJ's decision the final decision of the Commissioner of Social Security Administration, s*ee Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013).  Hoffman then filed this action seeking judicial review of the Commissioner's decision.  *See* 42 U.S.C. § 405(g).  The parties consented to this court's jurisdiction.  *See* 28 U.S.C. § 636(c); (R. 8).

## Facts

Hoffman alleges that he has been unable to work since September 30, 2009,[1] as a result of medical impairments.  (A.R. 129.)  He has been HIV positive since 1986 and has suffered from degenerative disc disease, neuropathy in his feet, diabetes, and other ailments.  (Id. at 157.)  After filing for disability benefits, Hoffman also suffered chest pains, necessitating the insertion of stents in 2010 and 2011.  (Id. at 424, 462.)  Hoffman smoked cigarettes for nearly 40 years but stopped in 2010.  (Id. at 433, 436.)  Hoffman was 50 years old at the time of his alleged disability onset date.  (Id. at 129.)  At his hearing before an ALJ, Hoffman supplied documentary and testimonial evidence in support of his claim.

## A.    Medical Records

Hoffman's medical records show that he has suffered from a number of impairments, including HIV, Hepatitis B, degenerative disc disease, back pain,

---

[1]  On May 14, 2012, Hoffman's counsel submitted a "pre-hearing memorandum," seeking to amend Hoffman's disability onset date from September 30, 2009, to December 23, 2009.  (A.R. 235-38.)  But, the ALJ referred to September 30, 2009, as the onset date in her opinion.  (Id. at 19.)

neuropathy, diabetes, coronary artery disease ("CAD"), hypertension, hearing loss, and depression. (A.R. 257, 332-36, 342-43, 467-71, 475-77.) Hoffman was diagnosed with HIV in December 1986. (Id. at 157, 255-57.) As of March 2012, Hoffman was taking four to five different medications for HIV. (Id. at 259, 450.) Hoffman reported that HIV "has always made [him] more tired than normal." (Id. at 157.) In his Disability Report, Hoffman said he naps in the afternoon and generally sleeps "between 12 and 14 hours a day" as a result of chronic fatigue from HIV. (Id.)

Hoffman was also diagnosed with degenerative disc disease in 2001. (Id. at 157, 333.) A July 2001 MRI of Hoffman's lumbar spine showed "[m]inimal bulging discs at all levels" and "[m]ultiple Schmorl's nodes." (Id. at 341.) A later study of Hoffman's lumbar spine, from July 2005, further showed "[d]egenerative disc disease and facet arthropathy." (Id. at 333.) A June 2002 study of Hoffman's cervical spine showed "stenosis" at C3-4, C4-5, and C5-6. (Id. at 340.) As a result of back pain, Hoffman reported that he:

> can barely bend over to touch the floor. [He has] difficulty putting on [his] socks and shoes in the morning. [He] cannot walk more than 100 feet without [his] hip and back being in constant pain. [He has] to stop for a bit if [he has] to walk further. When [he does] the grocery shopping, [he needs] to use the cart to help with [his] pain. [He] cannot lift more than 25 lbs. When [he takes] out the garbage, [he has] to lie down or sit afterwards for 15 minutes. It hurts when [he makes] supper . . . .

(Id. at 157.) On May 21, 2010, Hoffman complained of back pain to Dr. John Kowalski of Cottage Grove Health Center and was prescribed Tramadol. (Id. at 476-77; see also id. at 475, 482.)

Additionally, Hoffman has suffered from neuropathy, which causes a "constant ache in both of his feet." (Id. at 252; see also id. at 433-34.) Dr. Kowalski has described Hoffman's neuropathy as a "neurological manifestation" of his HIV infection. (Id. at 256.) Hoffman has taken the prescription medication Neurontin (Gabapentin) for neuropathy since at least 2009. (Id. at 252, 281, 395, 435.) However, a January 2011 MRI of Hoffman's brain did not show any abnormalities. (Id. at 408.) Other medical records also report normal neurological findings. (See, e.g., id. at 261, 434.)

Hoffman also has a history of heart issues. Hoffman underwent an echocardiogram in October 2005, and the results were "abnormal . . . due to . . . concentric left ventricular hypertrophy." (Id. at 332.) After experiencing chest pains, Hoffman went to Stroger Hospital in August 2010, and was thought to have "[t]ypical angina." (Id. at 432-38; see also id. at 419.) A coronary angiogram showed that Hoffman had two-vessel CAD. (Id. at 424.) Hoffman had a stent placed in 2010, followed by another stent in 2011. (Id. at 424, 462.)

Furthermore, Hoffman has reported hearing loss. A February 2003 hearing test revealed that Hoffman has "mild to moderately severe sensorineural hearing loss above 500Hz in the right ear" and "severe to profound sensorineural hearing loss" in the left ear dating back to birth. (Id. at 335.) The audiologist who performed the test recommended hearing aids, (id. at 336), but Hoffman opted instead to use an amplifier because of financial hardship, (id. at 322). After another hearing test in September 2010, an audiologist determined that Hoffman would

"experience difficulties discerning some/all speech sounds, [left ear greater than right ear], when presented at/below normal conversational level." (Id. at 411.) During a January 24, 2011 visit with an otolaryngologist, Hoffman was observed to be "[g]etting [a] reasonably good result with hearing aids." (Id. at 408.)

Finally, Hoffman has been diagnosed with Diabetes Mellitis, hypertension, Hepatitis B, and depression. (Id. at 252, 257, 343, 426). As of March 2012, Hoffman's list of current medications included: Pantoprazole, Plavix, TriCor, Aspirin, Emtricitabine-tenofovir, Enalapril, Neurontin (Gabapentin), Hydrochlorothiazide, Loperamide, Lopinavir-ritonavir, Metformin, Metoprolol, Pravastatin, Pyridoxine, Raltegravir, and Saquinavir. (Id. at 390-91.) Many of these are prescribed to be taken daily. (Id.)

Dr. Kowalski completed a residual functional capacity ("RFC") questionnaire for Hoffman on July 2, 2010, about a month before Hoffman experienced cardiac issues. (Id. at 342-46.) Dr. Kowalski treated Hoffman from approximately 2002 through December 2011, when Dr. Kowalski retired. (Id. at 490, 493; see also id. at 462-76, 479, 482-86, 488-89.) In the RFC questionnaire, Dr. Kowalski listed Hoffman's diagnoses as AIDS, peripheral neuropathy, Hepatitis B, and back discitis. (Id. at 342; see also id. at 237.) He described Hoffman's symptoms as "pain in low back," "numbness in lower legs and feet," and pain when bending and walking, (id. at 342), and opined that he was suffering from depression and impairments that "frequently" interfere with "attention and concentration needed to

perform even simple work tasks," (id. at 343). Dr. Kowalski concluded that Hoffman was functionally limited in the following ways:

   a.   can walk one-half block without rest or severe pain;

   b.   can sit for 45 minutes at one time;

   c.   can stand for 30 minutes at one time; . . .

   l.   can never crouch/squat or climb ladders and rarely can stoop (bend); and . . .

   n.   is likely to have "good days" and "bad days" and to be absent from work more than four days each month as a result of his impairments or treatment.

(Id. at 342-46.)

Dr. Shilpa Patel also completed an assessment for Hoffman on April 2, 2012. (Id. at 493-99.) Following Dr. Kowalski's retirement, Hoffman visited Dr. Patel on two occasions, on February 24 and March 12, 2012. (Id. at 390-97, 453-56.) Dr. Patel did not observe any issues in the review of systems or the physical examination of Hoffman. (Id. at 390, 394.) But attached to her April 2012 assessment form was a note stating that "Dr. Patel filled out what she thought she could because she really has not seen this patient enough to really be able to assess." (Id. at 493.) When asked to assess Hoffman's limitations as a result of his impairments, Dr. Patel answered, "unable to assess." (Id. at 498-99.)

## B.   Opinions of State Consulting Physicians

Dr. Reynaldo Gotanco reviewed Hoffman's medical records on May 17, 2010, and concluded that Hoffman: can lift 20 pounds occasionally; stand, walk, and sit for six hours each in an eight-hour day; occasionally climb ramps and stairs, but

never ladders, ropes, or scaffolds; and "should avoid concentrated exposure to hazards." (A.R. 318-25.) Dr. Gotanco noted that Hoffman's range of motion of the lumbar spine was "slightly limited," although there was "[n]o redness, swelling or tenderness of any joint." (Id. at 325.) Dr. Gotanco disagreed with Hoffman's claim that he needs to rest after walking 100 feet. (Id.) Dr. Gotanco also concluded that there was "[n]o evidence of neuropathy." (Id.)

Dr. M.S. Patil saw Hoffman for an Internal Medicine Consultative Examination[2] at the request of the Bureau of Disability Determination Services ("DDS"). Dr. Patil met with Hoffman for 40 minutes and reviewed his records sent by DDS. (Id. at 259.) Dr. Patil did not have access to Hoffman's "past x-rays, MRI's, EMG etc." (Id. at 262.) Based on the information she did have, Dr. Patil found that Hoffman was overweight and had: a normal gait and speech; no paravertebral tenderness or spasm; a normal neurological examination; no lymphadenopathy or other noticeable side effects from HIV; mild to moderate hearing loss at a distance of six feet; and stable blood pressure. (Id. at 260-62.)

C.    **Hoffman's Hearing Testimony**

At his hearing before the ALJ, Hoffman testified about his education and work history. He graduated from high school, completed two years of college, and attended a six-month vocational training program. (A.R. 41.) Hoffman last worked in September 2009 as a school bus driver. (Id. at 44.) He was fired from that

---

[2] Two reports from Dr. Patil appear in the administrative file. (A.R. 259-62, 314-17.) One report is dated March 12, 2010. (Id. at 259-62.) The other report is dated May 12, 2010. (Id. at 314-17.) However, these two reports appear to be identical, except for the different dates.

position, allegedly for failing to complete an accident report after bumping another driver's mirror. (Id.) From 2007 to 2008, Hoffman conducted inventory, and he previously was an inventory control supervisor. (Id.) Hoffman also worked as a data conversion operator for the U.S. Postal Service from 1995 to 1999, a newspaper carrier, and a temporary employee. (Id. at 45, 53-54.)

Hoffman also testified about his medical issues. He said that "pain in [his] back and in [his] feet" limits his ability to work. (Id. at 45.) He experiences constant "pin prickling" in his feet, which "distracts [him] a lot." (Id. at 45-46.) He has been prescribed lidocaine patches for his back pain, but the medication has not been effective. (Id. at 46.) He suffers from diabetes and takes metformin for that condition. (Id. at 47.) He is also deaf in his left ear and has limited hearing in his right ear. (Id. at 47-48.) He takes several HIV medications, as well as blood pressure medication. (Id. at 48.) He experienced a cardiac episode in August 2010 and has had two stents placed in his heart since that time. (Id. at 52.)

Hoffman testified that his pain limits his daily activities in many ways: he cannot walk or sit for long durations because of his back pain; he can only comfortably lift items weighing four or five pounds; he can be on his feet for only about five minutes because of his neuropathy; he needs to sit or lay down to take pressure off his feet; and he can sit in a chair for only about twenty minutes before needing to stand. (Id. at 46, 48-49.) As for his current living situation and daily activities, Hoffman testified that he lives with his parents and does "all the housework, cooking, cleaning." (Id. at 42, 49; see also id. at 130.) He also watches

television, spends about eight hours a day on the computer, using Facebook and "lots of email," showers and generally takes care of himself, sings in the church choir, plays hand bells at church, and naps for about three hours each day. (Id. at 50-51, 54.)

## D.  Vocational Expert's Hearing Testimony

A vocational expert ("VE") also testified at the hearing. The VE classified Hoffman's prior work as a bus driver as semi-skilled, medium work and as a newspaper carrier as unskilled, light work. The VE also classified Hoffman's prior work as a stock control supervisor as skilled, light work. (A.R. 56-58.) The ALJ asked the VE a series of questions regarding whether someone with specific hypothetical RFCs could perform Hoffman's past work. (Id.) First, the ALJ described a person with the following limitations:

> [O]ccasionally lift/carry 20 pounds, stand/walk/sit six hours out of an eight-hour workday, push/pull without limitation. No climbing of ladders, ropes or scaffolds.
>
> Occasional climbing of ramps and stairs, exposure to hazards such as machinery and unprotected heights.

(Id. at 56 ("first RFC").) The VE testified that such a person could not perform Hoffman's past work. (Id. at 57.) The ALJ next described a person with the following limitations:

> Lift up to 10 pounds. Occasionally lift/carry items such as docket files, ledgers or small tools. Stand/walk two hours out of an eight-hour workday, sit six hours out of an eight-hour workday.
>
> Push/pull without limitation. No climbing of ladders, ropes or scaffolds. Occasional climbing of ramps and stairs, exposure to hazards such as machinery and unprotected heights.

(Id. at 57 ("second RFC").)  The VE gave the same answer.  (Id.)  The ALJ then asked the VE whether a person with "the same age, education, and work experience" as Hoffman and the limitations set forth in the first RFC could perform any occupations.  (Id.)  The VE testified that such a person could perform unskilled, light jobs, such as a small products assembler, packager, or sorter.  (Id.)

## E.     The ALJ's Decision

The ALJ evaluated Hoffman's claim under the required five-step analysis. *See* 20 C.F.R. § 416.920.  The ALJ concluded that:  (1) Hoffman has not engaged in substantial gainful activity since the application date; (2) Hoffman's HIV, degenerative disc disease, diabetes, Hepatitis B, hypertension, CAD, and obesity are severe impairments; (3) these impairments do not meet or equal a listed impairment; (4) Hoffman has the RFC to perform light work with additional limitations; and (5) based on this RFC, Hoffman can perform jobs that exist in significant numbers in the national economy.  (A.R. 19-31.)

The ALJ found that Hoffman was not fully credible.  (Id. at 24-29.)  The ALJ explained that Hoffman's testimony regarding the "intensity, persistence and limiting effects" of his ailments was "not entirely consistent" with or supported by the medical evidence.  (Id. at 24.)  The ALJ found that Hoffman's medical records showed only routine, conservative, and sporadic treatment for his impairments without specific limitations.  (Id. at 24-26.)  In particular, the ALJ cited records from Dr. Patil, showing that Hoffman had: a normal physical and neurological exam; reduced range of motion only in the lumbar spine and without "paraveterbral

10

spasm or tenderness"; normal gait and review of systems; undetectable HIV viral load; stable blood pressure; and no ulcers or neurovascular deficits. (Id.) The ALJ also considered other factors, including Hoffman's "poor work history," lack of "narcotic pain medication or therapy," admission that "he can use a computer eight-hours a day," and general lack of side effects from his medications. (Id. at 27.) The ALJ noted that Hoffman's daily activities, such as doing household chores, driving, and going to the grocery store and church suggested greater functional ability than described by Hoffman. (Id.)

The ALJ also weighed the medical opinions in the file. The ALJ afforded "great weight" to Dr. Patel's records because "[her] opinions are consistent with the normal review of systems exams" and she is a "primary treater" for Hoffman's HIV. (Id. at 28.) According to the ALJ, Dr. Patel "opined that the claimant has no functional limitations related to HIV." (Id.) The ALJ incorrectly referred to Dr. Patel in this section as Dr. Patil but correctly cited medical records from Dr. Patel. (Id.; see also R. 20, Govt.'s Br. at 9 n.3.) Similarly, the ALJ granted "great weight" to Dr. Gotanco, who concluded that Hoffman has an RFC to perform "light" work with restrictions, such as never climbing ladders, ropes, or scaffolds, occasionally climbing ramps and stairs, and avoiding concentrated exposure to hazards. (A.R. 29.) By contrast, the ALJ gave "little weight" to Dr. Kowalski's findings because they were "inconsistent with the other medical evidence." (Id. at 28.) The ALJ found "no basis" for Dr. Kowalski's conclusions that Hoffman would

miss four or more days of work per month or that Hoffman required sedentary work. (Id.)

## Analysis

Hoffman challenges several aspects of the ALJ's decision. Hoffman asserts that the ALJ improperly weighed medical opinions of record, that she failed to perform a proper RFC analysis, and that she did not properly evaluate his credibility. (R. 12, Pl.'s Mem. at 1.) This court reviews the ALJ's decision only to ensure that it is based on the correct legal criteria and supported by substantial evidence. *See Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The ALJ is required to "build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014). But the court is "not free to replace the ALJ's estimate of the medical evidence" with its own, *see Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), and must uphold the decision even where "reasonable minds can differ over whether the applicant is disabled," *see Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). However, where the Commissioner commits an error of law, and the error is not harmless, the court must reverse the decision regardless of the evidence supporting the factual findings. *See Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

## A.  Medical Opinions

Hoffman asserts that the ALJ did not properly weigh the medical opinions of record.  (R. 12, Pl.'s Mem. at 12-15.)  An ALJ is entitled to resolve evidentiary conflicts "by giving more weight to some evidence and less to others."  *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).  Yet an ALJ cannot dismiss medical evidence without substantial justification.  *See Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) ("An [ALJ] can reject an examining physician's opinion only for reasons supported by substantial evidence in the record.").  Furthermore, an ALJ "cannot substitute [her] expertise for that of a qualified physician, and, absent countervailing clinical evidence or a valid legal basis for doing so, cannot simply disregard the medical conclusions of a qualified physician."  *Pancake v. Amax Coal Co.*, 858 F.2d 1250, 1255 (7th Cir. 1988).

Here, the ALJ discussed three medical opinions—from Drs. Patel,[3] Gotanco, and Kowalski—in explaining her decision that Hoffman was capable of performing light work with certain restrictions.  (A.R. 28-29.)  Hoffman first disputes the ALJ's reliance upon Dr. Patel's opinion because she evaluated Hoffman on only two occasions and expressly disclaimed the ability to assess Hoffman's limitations.  (R. 12, Pl.'s Mem. at 13; A.R. 390-93, 394-97, 453-56, 493-99.)  The ALJ afforded

---

[3]  The ALJ incorrectly referred to Dr. Shilpa Patel as "Dr. Patil" in the opinion.  (A.R. 28.)  Dr. M.S. Patil conducted an Internal Medicine Consultative Examination of Hoffman on March 12, 2010.  (Id. at 259-62.)  Although the ALJ referred to "Dr. Patil" in the section of her opinion addressing the medical opinion evidence, the ALJ cited only to Dr. Patel's assessment form and treatment records.  (Id. at 28-29.)  As a result, the Commissioner agrees that "the ALJ incorrectly referred to Dr. Patel as 'Dr. Patil' in this section of the decision, but correctly cited Dr. Patel's medical exhibits."  (R. 20, Govt.'s Br. at 9 n.3.)

"great weight" to Dr. Patel's report, finding that it "indicat[es] that Plaintiff was not limited by his HIV-related symptoms" and that the opinion rendered therein "is consistent with the records, including [her] treatment notes." (A.R. 28.) However, the ALJ nowhere mentioned that Dr. Patel had seen Hoffman on only two occasions, on February 24 and March 12, 2012—or that Dr. Patel disavowed her ability to accurately assess Hoffman's limitations. (Id. at 493-99.) Indeed, the cover sheet attached to Dr. Patel's assessment form states, "Dr. Patel filled out what she thought she could because she really has not seen this patient enough to really be able to assess." (Id. at 493.) Furthermore, when asked to assess Hoffman's functional limitations as a result of his impairments, Dr. Patel answered that she was "unable to assess." (Id. at 498-99.)

The ALJ erred by giving "great weight" to Dr. Patel's opinion without considering the requisite factors. The ALJ was required to consider such factors as "whether a physician is a treating or examining physician; the length, nature, and extent of the treatment relationship; the physician's specialty; and the consistency and supportability of the physician's opinion." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996) (citing 20 C.F.R. §§ 404.1527(a)-(d), 416.927(a)-(d)). "When the treating source has seen [the claimant] a number of times and long enough to have obtained a longitudinal picture of [the claimant's impairment] . . . the source's opinion [is given] more weight." 20 C.F.R. § 404.1527(c)(2)(i). Here, the ALJ failed to consider the brief length of time that Dr. Patel had been treating Hoffman, the fact that she had only seen Hoffman twice, and Dr. Patel's own professional

judgment that she did not have enough information to assess him. *See Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (finding error where the ALJ "said nothing regarding [the] required checklist of factors for determining what weight to afford a medical opinion").

The Commissioner maintains that the "length of treatment [does not] trump all other assessment factors." (R. 20, Govt.'s Resp. at 10.) To be sure, the Seventh Circuit has found unpersuasive a disability claimant's argument that a consulting physician's opinion should be rejected where he treated the claimant only once. *See Books*, 91 F.3d at 979. As Hoffman points out, however, the ALJ did not even discuss the length of treatment factor in her analysis, as required under 20 C.F.R. § 404.1527(c). (R. 21, Pl.'s Reply at 2.) Moreover, the Commissioner fails to acknowledge—let alone explain—the ALJ's failure to discuss Dr. Patel's disclaimers. Accordingly, substantial justification is lacking for the ALJ's decision to afford Dr. Patel's opinion "great weight." *See Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985) (finding that an ALJ's final decision determining how much weight to grant a physician must be supported by substantial evidence).

Hoffman also disagrees with the ALJ's granting of "great weight" to Dr. Gotanco. (R. 12, Pl.'s Br. at 15.) The ALJ justified the weight accorded to Dr. Gotanco's opinion on the ground that it was "consistent with the record as a whole," including "treatment records." (A.R. 29.) The ALJ did not mention that Dr. Gotanco had never treated or examined Hoffman. (Id.) Generally, a report from a non-examining physician is entitled to less weight than that of a treating

physician. *See* SSR 96-6p ("[T]he opinions of physicians . . . who do not have a treatment relationship with the individual are weighed by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required of treating sources."). Indeed, "[a]n [ALJ] can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel*, 345 F.3d at 470.

The Commissioner tries to lend credibility to the ALJ's reliance on Dr. Gotanco's opinion by stating that the physician reviewed Dr. Patil's examination report. (R. 20, Gov.'s Br. at 10.) But the ALJ did not note in her opinion that Dr. Gotanco had reviewed Dr. Patil's records. (A.R. 29.) The ALJ also did not point to any specific medical records supporting Dr. Gotanco's opinion, discuss his qualifications, or explain his opinions. (Id.) Furthermore, the ALJ did not discuss whether Dr. Gotanco had reviewed all of the medical evidence, a relevant question, given his conclusion that there was "[n]o evidence of neuropathy," despite a number of records suggesting otherwise. (See, e.g., id. at 252, 255-57, 310-12, 407, 433-34, 466, 469-70.)

In contrast to the "great weight" afforded to Drs. Patel and Gotanco, the ALJ granted only "little weight" to Hoffman's longstanding treating physician, Dr. Kowalski. The ALJ was required to address the factors set forth in 20 C.F.R. § 404.1527 in determining how much weight to give Dr. Kowalski's opinion. The ALJ erred by not addressing such factors as: "the length, nature, and extent of the

treatment relationship" and "the physician's specialty." *Id.* The ALJ stated that "Dr. Kowalski saw the claimant every three months," (A.R. 28), but did not discuss the length of the treating relationship, which lasted from about 2002 to late 2011, when Dr. Kowalski retired, (id. at 490, 493). Typically, "[w]hen evaluating a conflict between the opinions of treating and consulting physicians . . . 'the ALJ must take into account the treating physician's ability to observe the claimant over a longer period.'" *Books*, 91 F.3d at 979 (quoting *Stephens*, 766 F.2d at 284). Indeed, according to the regulations, "[g]enerally, the longer a treating source has treated [the claimant] and the more times [the claimant has] been seen by a treating source, the more weight [will be given] to the source's medical opinion." 20 C.F.R. § 404.1527(c)(2)(i). In this case, the ALJ disregarded Dr. Kowalski's opinion without addressing the longitudinal picture that Dr. Kowalski had gained having treated Hoffman over a span of nearly a decade with a frequency of visits every three months. (A.R. 28; see also id. at 255-57, 269-286, 462-76, 479-86, 488-90 (showing medical records from Dr. Kowalski from at least 2008 to 2011).)

Nor did the ALJ discuss the nature or extent of the treatment relationship. (Id. at 28.) Dr. Kowalski's specialty was in treating patients with HIV infections. (See, e.g., id. at 255-57, 488-90.) Hoffman saw Dr. Kowalski regularly for routine check-ups and regular monitoring of blood work. (See, e.g., id. at 467-76, 479-86.) During those visits, Dr. Kowalski addressed Hoffman's medical issues pertaining not only to HIV and side effects from HIV medications, but also issues related to his

other ailments, such as hepatitis, thrombocytopenia, peripheral neuropathy, and chronic fatigue, and chronic back pain. (See, e.g., id. at 255-57, 476-77, 490.)

Instead of focusing on relevant factors like Dr. Kowalski's HIV specialty and the length and depth of his treatment relationship with Hoffman, the ALJ criticized Dr. Kowalski's opinion for its purported lack of consistency with other medical evidence. (Id. at 28.) The ALJ found that Dr. Kowalski did not provide evidence in his records of having prescribed "narcotic pain medication, or recommend[ing] surgery or physical therapy for Hoffman's spinal problems." (Id.) The ALJ further discredited Dr. Kowalski based upon a "lack of neurological findings on the exams" and because Hoffman "only experienced minor chest pain after his cardiac surgery." (Id.) But there is no evidence that spinal, neurological, or cardiological issues are within Dr. Kowalski's specialty. The ALJ therefore appears to have selectively analyzed the record to focus on medical issues that were not Dr. Kowalski's focus in order to minimize his opinion. *See Pancake*, 858 F.2d at 1255 ("[A]n ALJ may not selectively analyze the record to reach a desired outcome."). The ALJ did not provide substantial justification for granting Dr. Kowalski's opinion "little weight," particularly in light of the deficiencies in the other medical opinions that the ALJ afforded "great weight." *See Gudgel*, 345 F.3d at 470. Accordingly, the court agrees with Hoffman that the ALJ erred by improperly weighing the medical opinions of Drs. Patel, Gotanco, and Kowalski.

**B.     The ALJ's RFC Assessment**

Hoffman also argues that the ALJ did not consider all of the relevant evidence in formulating the RFC finding, including: Hoffman's inability to stand/walk because of back pain and peripheral neuropathy in the feet; his inability to maintain a full-time work schedule because of chronic fatigue; and his inability to concentrate because of pain.   (R. 12, Pl.'s Mem. at 8-12.)   Policy Interpretation Ruling 96-8p provides that, "[t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."   SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996). Although an ALJ is not required to discuss every piece of evidence, she must consider all of the evidence that is relevant to the disability determination and provide enough analysis in her decision to permit meaningful judicial review.  *See Young*, 362 F.3d at 1002; *Clifford v. Apfel*, 227 F.3d 863, 870-71 (7th Cir. 2000).  The ALJ must also "consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity."  *See* 20 C.F.R. § 416.923.  The ALJ is required to undertake this analysis because the combination of a claimant's impairments "might well be totally disabling" even if each of the claimant's impairments standing alone is not serious.  *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011).

Here, the ALJ's failure to properly weigh the medical opinions casts serious doubt on the RFC assessment.   Because she granted only "little weight" to

Dr. Kowalski's opinion, this court cannot assume that the ALJ fully considered the combined effect of Hoffman's impairments. *See Martinez*, 630 F.3d at 698. In contrast to the ALJ's weighing of medical opinions, for the RFC assessment the ALJ relied upon Dr. Patil's examination report in addition to Drs. Patel's and Gotanco's opinions and medical records. (A.R. 25-26.) Even so, the ALJ did not explain in her RFC analysis how she resolved the inconsistencies between Dr. Patil's and Dr. Kowalski's findings. *See* SSR 96-8p, 1996 WL 374184, at *7.

Moreover, in assessing Hoffman's RFC, the ALJ relied upon the fact that Dr. Kowalski never prescribed "narcotic pain medication" as part of Hoffman's treatment regimen. (A.R. 28.) However, Dr. Kowalski prescribed Tramadol, Neurontin (Gabapentin), and Amitriptyline for Hoffman's back pain and/or neuropathic pain. (Id. at 342, 435, 450, 454, 476-77.) While these pain medications may not qualify as "narcotics," the medical records show that they were used to treat Hoffman's pain. (Id.) The ALJ's emphasis on "narcotic pain medication" versus other "pain medication" gives this court pause because applicable rules speak only of pain medication, not *narcotic* pain medication. *See, e.g.*, SSR 96-7p, 1996 WL 374186, at *2. As a result, the court cannot determine that the ALJ adequately considered Hoffman's complaints of pain in crafting the RFC. Given the ALJ's clear error in weighing the medical opinions, this court finds that the ALJ "failed to build the 'accurate and logical bridge from the evidence to [her] conclusion'" regarding Hoffman's RFC. *Young*, 362 F.3d at 1002 (quoting *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002)).

## C.     Hoffman's Credibility

Finally, Hoffman argues that the ALJ improperly evaluated his credibility. (R. 12, Pl.'s Mem. at 8-12.)  In assessing the credibility of a claimant's statements that are at odds with objective medical evidence, an ALJ should consider:

> (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of medication the claimant takes to alleviate pain; (5) treatment, other than medication, that the individual has received for relief of pain; (6) any other measures the individual uses to relieve pain; and (7) any other factors concerning the individual's functional limitations.

*Keller v. Colvin,* No. 13 CV 6029, 2014 WL 6613383, at *8 (N.D. Ill. Nov. 21, 2014) (citing SSR 96-7p, 1996 WL 374186, at *2).  This court grants special deference to an ALJ's credibility determination, given the ALJ's ability to observe the claimant as he testifies.  *See Castile v. Astrue*, 617 F.3d 923, 928-29 (7th Cir. 2010).  In practical effect, this deference means that "[r]ather than nitpick the ALJ's opinion for inconsistencies or contradictions, [district courts] give it a commonsensical reading" and reverse only those credibility determinations that are "patently wrong." *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).

In the present case, the ALJ found incredible Hoffman's "statements concerning the intensity, persistence, and limiting effects of [his] symptoms." (A.R. 24, 28.)  The ALJ further found that "the medical evidence does not support [Hoffman's] inability to perform less than the full range of light work with identified restrictions." (Id. at 24.)  Hoffman maintains that the ALJ erred in her credibility determination and, as a result, improperly dismissed testimony and evidence

regarding Hoffman's peripheral neuropathy, back pain, and chronic fatigue, and placed too much weight on Hoffman's basic daily activities. (R. 12, Pl.'s Mem. at 8-12.) As is the case with the ALJ's RFC assessment, this court has concerns about the ALJ's credibility determination in light of the improper weighing of medical opinions. To be sure, the ALJ's failure to give appropriate weight to Dr. Kowalski's opinion may have resulted in a "flawed determination" that Hoffman's complaints about neuropathic and back pain and fatigue were not credible. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). As a result, when relying upon different medical opinions, the ALJ on remand may reach a different conclusion regarding Hoffman's credibility. However, unlike the ALJ's weighing of medical opinions, in her credibility analysis the ALJ relied upon Dr. Patil's examination report, in addition to Drs. Patel's and Gotanco's opinions and medical records. (A.R. 25-26.) Bearing in mind this distinction between the ALJ's credibility analysis and the weighing of medical opinions, along with the highly deferential standard for reviewing an ALJ's credibility determination, *see Castile*, 617 F.3d at 928-29, this court addresses Hoffman's credibility criticisms in turn.

First, the ALJ considered Hoffman's complaints of peripheral neuropathy in finding them not fully credible. (A.R. 23-27.) The ALJ referred to Hoffman's testimony that "neuropathy in his feet distracts him, causes him difficulty with concentration, and prevents him from working." (Id. at 23.) The ALJ also noted Hoffman's testimony that he has "constant pain in his feet," which feels like "pins and needles" and requires him to raise his feet frequently to relieve the pain. (Id.)

Furthermore, the ALJ cited Dr. Kowalski's medical records showing that Hoffman had suffered from "peripheral neuropathy of lower extremities [for] 15 years [as a result of a] medication side effect." (Id. at 24-25, 433-34; see also id. at 252, 281, 407 (reflecting Hoffman's complaints of foot pain).)

Despite Hoffman's testimony and evidence showing that he suffers from neuropathy, the ALJ pointed to medical records supporting her finding that Hoffman has the RFC to perform light work with restrictions. (Id. at 24-26.) For example, the ALJ referred to records showing that Hoffman's extremities, neurological exam, and gait remained normal, and there were no neuropathy-related complications noted during his 2010 and 2011 medical examinations. (Id. at 25-26.) The ALJ cited Dr. Kowalski's March 12, 2010 report noting Hoffman's diagnosis of peripheral neuropathy of the legs but not marking any restrictions. (Id. at 25, 257.) The ALJ further cited a March 12, 2010 report from Dr. Patil referring to Hoffman's history of neuropathy but observing a normal gait, normal sensations, and normal motor strength. (Id. at 25-26, 259-62.) Additionally, the ALJ cited evidence showing that Hoffman's neuropathy was controlled. (See id. at 262, 316, 434-35.) Thus, the ALJ provided specific reasons for her credibility determination as to Hoffman's neuropathy. *See Moss*, 555 F.3d at 561. However, when the ALJ considers different medical opinions on remand, and views Hoffman's subjective complaints of pain in light of that evidence, the ALJ may reach a different credibility determination regarding Hoffman's neuropathic pain. *See id.* ("[A]n ALJ cannot disregard subjective complaints of disabling pain just because a

determinable basis for pain of that intensity does not stand out in the medical record.") (citing SSR 96-7p).

Second, the ALJ explained in detail why she did not find fully credible Hoffman's complaints of back pain. The ALJ considered Hoffman's testimony that "his back pain varies in intensity, and prolonged sitting and walking exacerbates his pain." (A.R. 23.) The ALJ also noted that, according to Hoffman, he could stand for five minutes at a time and sit for twenty minutes at a time. (Id.) Moreover, the ALJ cited diagnostic tests showing Hoffman's degenerative disc disease, facet arthropathy, end plate herniation, schmorl nodes at multiple levels in the lumbar spine, and stenosis at multiple levels in the cervical spine. (Id. at 24, 333, 339-41.)

Nevertheless, the ALJ determined that medical records post-dating the application date showed only "sporadic treatment with no limitations in the cervical spine and only reduced range of motion in the lumbar spine." (Id. at 24.) The ALJ relied upon Dr. Patil's examination showing a lack of "paraveterbral tenderness or spasm in the spine" and normal gait, extremities, neurology, and review of systems. (Id. at 24, 261, 316.) The ALJ also pointed to other records, including reports from Dr. Patel, generally showing normal review of systems and no neurological or extremities limitations. (Id. at 24, 449-56.) Moreover, despite Hoffman's claims of disabling back pain, the ALJ found that Hoffman was able to work at the "substantial gainful level" after his diagnosis, and he did not have a history of pain management or therapy. (Id. at 26-27; but see id. at 476-77.)

Hoffman argues that the ALJ erred by not considering that Hoffman's back condition had worsened over time. (R. 12, Pl.'s Mem. at 10.) But the ALJ cited medical records dating from 2001 to 2012, and found that the more recent records did not support Hoffman's allegations regarding worsening back issues. (A.R. 26.) Indeed, the ALJ found that "[s]ince the application date, the medical records did not show any specific change in [Hoffman's] spinal condition, apart from decreased range of motion of the lumbar spine." (Id.; see also id. at 261, 316, 449-56.)

Hoffman also asserts that the ALJ improperly relied upon Hoffman's ability to work part time after his degenerative disc disease diagnosis in finding that Hoffman could work full time, citing *Pierce v. Colvin*, 739 F.3d 1046, 1050-51 (7th Cir. 2014), for support.[4] (R. 12, Pl.'s Mem. at 10.) But in that case the ALJ erred on the facts about how much the claimant had worked. *Pierce*, 739 F.3d at 1050. Here, Hoffman does not accuse the ALJ of misstating facts about his work history. And the *Pierce* court found that "a claimant's dogged efforts to work beyond her physical capacity [is] highly relevant in deciding her credibility and determining whether she is trying to obtain government benefits by exaggerating her pain symptoms." *Id.* at 1051. Thus, although the ALJ provided a detailed explanation of her credibility finding as to Hoffman's complaints of back pain, when considering different medical opinions on remand, the ALJ may necessarily alter her analysis regarding the relevance of Hoffman's part-time work.

---

[4] Hoffman also challenges the ALJ's reliance upon Hoffman's "spotty work history with mostly minimal earnings" as part of her credibility determination. But an ALJ may properly consider sporadic or declining earnings. *See McCurrie v. Astrue*, 401 Fed. Appx. 145, 149-50 (7th Cir. 2010).

Third, Hoffman challenges the ALJ's failure to account for fatigue as a result of HIV, diabetes, and obesity in limiting his ability to work. (R. 12, Pl.'s Mem. at 11.) The Seventh Circuit repeatedly has found that "an ALJ's 'adequate discussion' of the issues need not contain 'a complete written evaluation of every piece of evidence.'" *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011). In any event, the ALJ considered Hoffman's testimony that he "usually takes a nap and lies down for three hours during the day." (A.R. 24.) The ALJ also discussed medical records relating to the underlying conditions allegedly causing Hoffman's fatigue, including HIV, diabetes, and obesity, as well as Hoffman's own statements about his daily activities, such as his ability to work on the computer for eight hours a day. (Id. at 24-27.) Although the ALJ did not separately evaluate Hoffman's subjective complaints of fatigue, her failure to do so does not necessarily render her credibility decision erroneous. *See McKinzey*, 641 F.3d at 891. Again here, however, the ALJ may view Hoffman's complaints of fatigue differently on remand when relying upon different medical opinions.

Fourth, Hoffman argues that the ALJ placed too much emphasis on his daily activities. The Seventh Circuit has cautioned against weighing daily activity factors too heavily in making credibility determinations because limited activities such as dressing, bathing, walking, and shopping do not necessarily mean that a person is capable of gainful employment. *See Bjornson v. Astrue,* 671 F.3d 640, 647 (7th Cir. 2012). At the same time, an ALJ may rely on a claimant's ability to perform daily activities to the extent such evidence is inconsistent with the

claimant's allegations regarding the degree of disability. *See Pepper v. Colvin*, 712 F.3d 351, 369 (7th Cir. 2013). Indeed, an ALJ is required to consider the claimant's daily activities. *See Filus v. Astrue*, 694 F.3d 863, 869 (7th Cir. 2012) ("In assessing a claimant's allegations of disabling pain, an ALJ must consider the claimant's daily activities . . . ."); *see also* SSR 96-7p, 1996 WL 374186, at *2.

Here, the ALJ found that Hoffman's testimony regarding his limitations was not consistent with his daily activities. (A.R. 27.) Hoffman testified that he: cannot walk or sit for long durations; can only comfortably lift items weighing only four or five pounds; can be on his feet for only about five minutes; needs to sit or lay down to take pressure off his feet; and can only sit in a chair for only about twenty minutes before needing to stand. (Id. at 46-49.) Yet Hoffman also testified that he does "all the housework, cooking, cleaning," watches television, spends about eight hours a day on the computer, showers and generally takes care of himself, sings in the church choir, and plays hand bells at church. (Id. at 42, 49 50-51, 54.) Furthermore, in his disability function report, Hoffman said he "take[s] out the garbage (weekly); sometimes mow[s]; rake[s] leaves," shops for groceries, and drives a car. (Id. at 187-91.) The ALJ concluded that "[s]uch activity and ability to function independently suggests that the claimant's symptoms are manageable and not as limiting as alleged." (Id. at 27.)

Hoffman contends that the ALJ failed to consider Hoffman's "qualifications on his daily activities." (R. 12, Pl.'s Mem. at 9.) Hoffman alleges that:

> he had to sit while showering; he had pain with shaving because it required him to stand too long; it was painful to stand and cook; while

he could prepare dinner, he could not do it all at once and had to take rest periods; he could walk about 75 feet before it started to hurt; [and] taking out the garbage "creates unbearable pain."

(Id. at 9-10 (internal citations omitted).)  Hoffman contends that an ALJ must account for such qualifications.  (Id. at 10.)  However, the ALJ considered Hoffman's testimony and records and found that "his physicians did not recommend a need to elevate his feet, lie down, or take a nap during the day."  (A.R. 27.)  The ALJ further noted that Hoffman had not had a history of pain management or therapy.  (Id. at 26-27; but see id. at 476-77.)  Accordingly, the ALJ provided a detailed explanation of the evidence and her reasoning to support her credibility determination. However, when properly weighing the medical opinions, the ALJ on remand may reach a different conclusion regarding Hoffman's limitations in performing household activities.

## Conclusion

For the foregoing reasons, Hoffman's motion is granted, the Commissioner's motion is denied, and the case is remanded for further proceedings consistent with this opinion.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**